JKC

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| SUE BOLING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 3:04-cv-572 |
| | ) | JURY TRIAL REQUESTED |
| BRIAN BARKER, | ) | Jordan/Shirley |
| GILBERT UNION BOILER | ) | |
| MORRISON KNUDSEN (GUBMK) | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

### Introduction

1. This is an action under 42 U.S.C ss 2000e-2, which prohibits employers from engaging in discriminatory employment practices based on an individual's gender. Related claims include claims under the Tennessee Human Rights Act, T.C.A. 4-21-201 et seq., prohibiting employers from engaging in discriminatory employment practices based on an individual's gender; claims under T.C.A. 50-1-304 et seq., prohibiting employers from retaliation in employment based on an individual's refusal to remain silent about illegal activities; claims under 42 U.S.C. 2000e-3, prohibiting employers from retaliation or engaging in activity protected by 42 U.S.C. 2000-e; and related state common law claims for negligent supervision and training.

### Jurisdiction and Venue

2. Jurisdiction is proper pursuant to 28 U.S.C. ss 1331, and 42 U.S.C. ss 2000-e and

employment, and which confers concurrent jurisdiction over such claims to both the federal and the state courts. A timely claim was filed with the Equal Employment Opportunity Commission.

3. Venue is proper pursuant to 28 U.S.C. ss 1391 as the unlawful employment practices occurred in Knox County, Tennessee, and both plaintiffs and all defendants are residents of the State of Tennessee.

**Parties**

4. Plaintiff, Sue Boling, is for all times material hereto a citizen of the United States and a resident of Loudon County, Tennessee. She is a former Administrative Assistant at Defendant GUBMK.

5. Defendant GUBMK is a company doing business in the State of Tennessee. Its registered agent for service of process is CT Corporation, at 500 South Gay Street Suite, Suite 2021, Knoxville, TN 37929-9710.

**General Allegations**

6. Sue Boling was first employed by GUBMK in July, 1999.

7. Sue Boling's husband, John Boling, is also employed by GUBMK.

8. At all times during her employment, Ms. Boling was an exemplary employee, receiving consistently excellent performance evaluations and routine compliments from her coworkers and supervisors. Ms. Boling received no reprimands or warnings during her employment for any reason.

9. Mr. Barker, the supervisor of both Mr. and Mrs. Boling, sexually propositioned and harassed Ms. Boling in the spring of 2002.

10. Ms. Boling refused his advances and reported them to Mr. Barker's supervisor, Mr. Vaughn.

11. At the time of harassment, Ms. Boling's husband, John Boling, was stationed in Paradise, Kentucky, at another GUBMK facility, working as an Electrical Supervisor.

12. Mr. Boling was scheduled to return to the Knoxville area, and take a position as Electrical Supervisor at the Kingston Steam Plant, by December, 2002.

13. The Bolings were very happy about this anticipated transfer. The position was anticipated to be a longterm assignment, which would allow them to live together as husband and wife, which they had been unable to do before because while they owned property in the Knoxville area, Mr. Boling's temporary assignment was in Kentucky.

14. Within two weeks of Ms. Boling's report of Mr. Barker's harassment to Mr. Vaughn, Mr. Barker surreptitiously changed a personnel request that had been previously approved by Mr. Vaughn. The altered request asked for other personnel to be assigned to the Kingston Steam Plant position previously offered to and accepted by Mr. Boling.

15. Mr. Boling's future with the company was rendered insecure at that point, because his assignment in Paradise was due to end in December, 2002.

16. In mid-July, the Bolings complained to Mr. Vaughn about this unapproved alteration of the records pertaining to the reassignment.

17. Mr. Vaughn reassured the Bolings that Mr. Boling would return to Knoxville in December, 2002 or January, 2003.

18. During this timeframe, Ms. Boling began experiencing severe emotional distress due to a combination of factors, namely, the continued inappropriate contact with Mr. Barker, Mr. Vaughn's failure to appropriately handle the matter, reassignment of her duties to menial tasks, and the "cold shoulder" treatment given to her by other employees in the office. Ms. Boling continued to answer to and be under the supervision of Mr. Barker, and to work in his close proximity.

19. Due to the constant stress of her work environment, Ms. Boling began to be treated for high blood pressure that her doctor identified was directly and solely caused by the hostile work environment in which Ms. Boling was working at the time.

20. Ms. Boling attempted to apply for workers' compensation for her high blood pressure and diagnosis of anxiety and depression, but her efforts to secure compensation were thwarted by GUBMK, which stated only that she could not receive benefits for "solely" mental illnesses.

21. Ms. Boling's efforts to explain that high blood pressure is a physical ailment that is compensable under the statute were not effective to cause GUBMK to process her claim.

22. During this timeframe, Ms. Boling's doctor released Ms. Boling to return to work on condition that she be assigned to work in space where she would not come into contact with Mr. Barker.

23. Ms. Boling requested this simple accommodation immediately.

24. GUBMK refused to accommodate Ms. Boling's request; therefore, Ms. Boling's doctor wrote her an excuse from work until September 9, 2002.

25. Hoping that this intolerable state of events would improve when Mr. Boling returned to Knoxville, and needing their jobs, Mr. Boling tried to simply perform his job.

25. Despite his efforts, Mr. Boling was subjected to retaliatory treatment due to his wife's complaint of sexual harassment.

26. Specifically, on or about August 3, 2002, an electrician under Mr. Boling's supervision was running a conduit on the south side of building on the construction site in Paradise.

27. The elevator was taken to the sixth floor and the operator told not to run it unless the electrician in the basket told him it was safe.

28. At approximately 4:15 pm, the operator saw another employee flagging him down. He started down and hit the ariel lift that the electrician was working on.

29. On August 23, 2002, at 1:45 pm, an employee named James McMillin turned in three requisitions to Mr. Boling. Mr. McMillen informed Mr. Boling that he had spoken to the manufacturer and the supplier and the papers were ready to be signed. He also told Mr. Boling that the manufacturer had stated that there would be an approximate delay of 20 days for delivery, and that if they could get the paperwork in immediately, they might be able to do better than 20 days.

30. Mr. Boling asked Mr. McMillan to take the requisitions to Larry Seals for his signature and to Jim Carpenter for numbers. Mr. Carpenter then instructed Mr. McMillen to take the requisitions to Brian Curtis for signature and leave them in his office by 2:00 pm.

31. Mr. McMillin did as he was instructed.

32. Shortly thereafter, Mr. Curtis called Mr. Boling into his office. He then cursed Mr. Boling for not bringing the requisition forms personally, and then destroyed the forms. Mr. Boling responded that he was simply trying to get the forms to Mr. Curtis in a timely fashion in order to avoid the 20 day delay in getting the materials from the manufacturer.

33. On or about August 27, 2002, Mr. Boling was reprimanded for the safety incident that occurred on August 3rd, even though the reprimand itself states that he followed the applicable procedures.

34. On or about August 28, 2002, Mr. Boling was formally reprimanded for "insubordination" related to the Curtis/Boling exchange. These two reprimands are the first two reprimands Mr. Boling has ever received from this or any other employer in his career.

35. On or about September 6, 2002, Ms. Boling's doctor released her to return to work. Ms. Boling called the company to inform them, and returned to work the following Monday, September 9, 2002.

36. Ms. Boling continued to work in a cold and hostile environment, under the supervision of her harasser, even though she has requested to be re-assigned to another facility in this large company, or to a different work station, pursuant to her doctor's written recommendations, which were themselves forwarded to the company.

37. Specifically, after Ms. Boling returned to work, she was effectively demoted. She was put back into a position that required her to type, and was relieved of other responsibilities, such as scheduling work for other administrative staff and coordinating the recruitment of temporary service workers.

38. On or about September 10, 2002, Mr. Vaughn admitted, in a closed door meeting with Ms. Boling, that he had been treating her differently because he felt "awkward," but that he wanted to "work through it" and "establish a working relationship with you as we had before anything happened."

39. Ms. Boling stated that she had always enjoyed working with Mr. Vaughn and wanted to re-establish that relationship also, and asked him to stop "shutting me out" of work. Mr. Vaughn asked if there was anything he could do to help Ms. Boling feel more comfortable, but rejected out of hand her suggestion that he ask Mr. Barker to apologize to her for his harassment.

40. Despite the generally positive content of that meeting, Ms. Boling continued to be "shut out."

41. Specifically, very few people, and certainly not her supervisor Mr. Vaughn, spoke to her for days on end. Ms. Boling spend all day every day typing, and was not given back her former, more rewarding job duties. Mr. Vaughn habitually cut Ms. Boling off from conversations with persons who would enter the office on business, and staff that worked within the office would rarely, if ever, even say "hello" to Ms. Boling. Mr. Vaughn had told Ms. Boling that her typing project was vitally important, but a month after she was assigned to a non-stop typing job, he had never asked her how she was progressing.

42. Throughout this time, Ms. Boling was reassured that Mr. Boling would return home following his assignment in Paradise, Kentucky, to work either at the Kingston Steam Plant or at Bull Run.

43. On or about November 22, 2002, Ms. Boling saw a request to a temporary agency for two electrical superintendents to perform the duties that Mr. Boling would have been assigned to do.

44. On or about December 18, 2002, Mr. Boling learned that he would be transferred, not to a plant near his wife in Knoxville, Tennessee, as had been promised him, but to a plant in Alabama.

45. Eventually, Ms. Boling's Family Medical Leave ended; however, GUBMK refused to assign her to any other secretarial position in any of the company's numerous locations, stating there was simply no way they could give her work that was not in close proximity to Brian Barker, which was the one limitation placed on her return to work by her doctor.

46. On or about December 2, 2002, Ms. Boling's employment at GUBMK was terminated.

47. After several delays, Mr. Boling finally returned to Knoxville sometime in March, 2003.

48. Because Ms. Boling was no longer employed by GUBMK, Mr. Boling was forced to accept a position with the company that represented a substantial paycut, and to procure health insurance that had previously been provided through Ms. Boling. The position also does not have the longevity and security as the position that should have been given to him at the Kingston plant.

49. Ms. Boling was unable to secure other employment as an Executive Secretary after she left GUBMK.

50. In an effort to supplement the family's income, Ms. Boling started her own business, to which she continues to devote all of her energies to this date.

**Count 1: Employer's violations of 42 U.S.C. 2000-e**

51. By the acts and omissions described in this Complaint, Defendant GUBMK has violated Title VII of the Civil Rights Act of 1964, as amended, in that Defendant has created and/or condoned a hostile work environment based on Plaintiff's gender, and retaliated against the Plaintiff when the Defendant effectively demoted the Plaintiff to a menial typing job, subjected her to the "cold shoulder" treatment, refused to process Plaintiff's valid claim for workers' compensation, reprimanded Plaintiff's husband based on pretextual reasons, and refused to remedy the assignment of Plaintiff's husband to a different plant than the assignment which would have allowed him to live indefinitely with Plaintiff, refused to accommodate Plaintiff's doctor's reasonable restrictions by reassigning the Plaintiff, and eventually terminating the Plaintiff.

52. Because of these acts and omissions, Plaintiff has suffered damages that entitle to her to relief under the Act, including back-pay, front-pay, attorneys' fees, costs, compensatory damages, punitive damages, discretionary costs and pre- and post-judgment interest.

**Count 3: Individual violations of 42 U.S.C. 2000-e**

53. By the acts and omissions described in this Complaint, individual Defendant Brian Barker has violated Title VII of the Civil Rights Act of 1964, as amended, in that Defendant personally participated in the creation of a sexually hostile work environment when he repeatedly propositioned the Plaintiff for sexual favors, and personally retaliated against

Plaintiff and Plaintiff's husband when Plaintiff complained by altering the personnel requisition request to remove Mr. Boling from his previously approved assignment at the Kingston Steam Plant and by instructing agents of the Defendant in Paradise, Kentucky to reprimand Mr. Boling on pretextual reasons.

54. Because of these acts and omissions, Plaintiff has suffered damages that entitle to her to relief under the Act, including back-pay, front-pay, attorneys' fees, costs, compensatory damages, punitive damages, discretionary costs and pre- and post-judgment interest.

**Relief Requested**

55. WHEREFORE, Premises considered, Plaintiff requests the following relief:

A. For a jury of twelve (12) to be empaneled to try this action.

B. That upon the final trial of this action, Ms. Boling be awarded the sum of one million, three hundred thousand dollars in damages, representing back pay, front pay in lieu of reinstatement, and compensatory damages, plus an equal amount as punitive damages, plus attorneys' fees, discretionary fees, and costs, together with pre- and post-judgment interest, and any other relief to which Ms. Boling is entitled under the law.

C. For preliminary and permanent injunctive relief, prohibiting Brian Barker from having any input into any personnel decision affecting Mr. Boling.

D. For such other, further and general relief as this Court deems reasonable, necessary and appropriate to make the Plaintiff whole.

Respectfully submitted this 30th day of November, 2003.

Sue Boling
Sue Boling
Plaintiff

Margaret Beebe Held
Margaret Beebe Held
Attorney for the Plaintiff

HELD LAW FIRM
1522 Highland Avenue
Knoxville, TN 37916
(865) 637-6550
BOPR #018033

STATE OF TENNESSEE
COUNTY OF KNOX

**AFFIDAVIT OF SUE BOLING**

I, Sue Boling, having been duly sworn according to the law, state that I have read the foregoing COMPLAINT and that the contents therein are true and correct to the best of my knowledge and belief, and that this Complaint is brought for no improper purpose, but in truth and sincerity for the reasons described therein.

DANIEL SMITHWICK STATE OF TENNESSEE NOTARY PUBLIC KNOX COUNTY

Sue Boling
Sue Boling
Affiant

Sworn to and subscribed before me this 29th day of November, 2004

Daniel Smithwick
Notary Public

My commission expires:____________________

My commission expires Oct. 11, 2008